*FILED*
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ JUL 2 1 2017 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

SHAMAINE DUNCAN,

                Plaintiff,

       -against-

THE CITY OF NEW YORK, et al.,

                Defendants.

-------------------------------------------------------------x
-------------------------------------------------------------x

EBONY DUNCAN, et al.,

                Plaintiffs,

       - against -

THE CITY OF NEW YORK, et al.,

                Defendants.

-------------------------------------------------------------x

**MEMORANDUM & ORDER**
11-CV-3901 (ENV)(JO)

12-CV-1565 (ENV)(JO)

VITALIANO, D.J.

      Plaintiffs Shamaine Duncan, Ebony Duncan, Harrison McCombs, Breyon Gray, and

Deborah Harrell have filed suit against the City of New York and several members of the New

York City Police Department:  Inspector John Denesopolis, and 120th Precinct Officers Frank

Aliffi, Jerry Garcia, Jin Tsoi, Bruce Ceparano, Jeff Desio, Bekim Kalicovic, Albert Isaac, John

Fahim, Michael Hotaling, Francisco Moncayo, Mashiel Santos, Gregory Howard, Christian

Cataldo, and Richard Dinkle.  *See Shamaine*, Dkt. No. 117 (fourth amended complaint)

("*Shamaine* Compl."); *Ebony*, Dkt. No. 122 (second amended complaint) ("*Ebony* Compl.").[1]

---

[1]     Consistent with the identifiers used by Magistrate Judge Orenstein, the Court will refer to
Shamaine and Ebony Duncan by their first names and to all other individuals by their surnames
and, accordingly, refer to the separate actions by either *Shamaine*, 11-CV-3901, or *Ebony*, 12-
CV-1565.  Shamaine Duncan is the sole plaintiff in *Shamaine*; Ebony Duncan, Harrison
McCombs, Breyon Gray, and Deborah Harrell are joined as plaintiffs (the "*Ebony* plaintiffs") in
*Ebony*

Plaintiffs charge defendants with violating their rights under federal and New York State law, and defendants now seek partial summary judgment in each action.[2] *Shamaine*, Dkt. No. 124; *Ebony*, Dkt. No. 132.

On September 29, 2016, Magistrate Judge James Orenstein issued a consolidated Report and Recommendation ("R&R) in which he recommended that defendants' motions for summary judgment be granted in part and denied it in part. *Shamaine*, Dkt. No. 141 ("R&R"); *Ebony*, Dkt. No. 148 ("R&R"). Pursuant to Federal Rule of Civil Procedure 72(b)(2), on October 17, 2016, defendants made timely objections in both the *Shamaine* and *Ebony* actions. *Shamaine*, Dkt. No. 142 ("*Shamaine* Obj."); *Ebony*, Dkt. No. 149 ("*Ebony* Obj."). Plaintiffs responded to these objections on November 21, 2016.[3] *Shamaine*, Dkt. No. 146 ("*Shamaine* Obj. Opp."); *Ebony*, Dkt. No. 153 ("*Ebony* Obj. Opp.").

After careful consideration of the R&R, defendants' objections, and plaintiffs' opposition to those objections, and upon *de novo* review, the Court adopts Magistrate Judge Orenstein's R&R, with certain modifications, as discussed below.

<u>Background</u>[4]

Ebony is the owner of a barbershop located at 411 Jersey Street on Staten Island (the "barbershop"), and on New Year's Eve 2011, the plaintiffs were gathered inside. At some point

---

[2]     Officer Dinkle is not named as a defendant in *Ebony*; therefore, no *Ebony* claims implicate him. All plaintiffs previously asserted, and have since withdrawn, claims against Officer Kalicovic. *Shamaine*, Dkt. No. 134 at 19; *Ebony*, Dkt. No. 142 at 29.

[3]     The Court granted plaintiffs' request for an extension of time to file their responses in both *Shamaine* and *Ebony*. *See Shamaine*, Dkt. No. 145; *Ebony*, Dkt. No. 151.

[4]     These facts are drawn, for the most part, from the parties' respective statements made pursuant to Local Civil Rule 56.1. Facts presented in this section without record citation are undisputed. A fuller factual recitation is set out in the R&R. *See* R&R at 2-4.

that night, a fight broke out nearby, shots were fired, and the police responded to several 911 calls by racing to Jersey Street. After the officers arrived, certain members of the crowd retreated inside the barbershop, and the officers – observing this – followed them. Ebony proceeded to tell the non-officer intruders who had entered the shop to leave. Defendants contend that Ebony also requested their assistance in removing the intruders, while plaintiffs assert that Ebony removed the unwanted persons on her own, and, moreover, informed the police of this when they arrived. *Shamaine*, Dkt. No. 128 (Defendants' Rule 56.1 Statement) ("D56") ¶¶ 70-71, 161-62; *Shamaine*, Dkt. No. 135 (*Shamaine* Response & Counter-Statement) ("S56") ¶¶ 70-71, 162; *Ebony*, Dkt. No. 143 (*Ebony* Response) ("E56") ¶¶ 70-71, 161-62. The police entry resulted in a confrontation between various officers, named as defendants, and plaintiffs.

What happened thereafter is, for the most part, hotly contested. In short, defendants assert that, while conducting a lawful investigation of Ebony's barbershop, they issued orders to plaintiffs that they disobeyed; disobedience of those orders resulted in a decision to make arrests. *See e.g.*, D56 ¶¶ 78, 86, 94-99. Defendants also allege that they discovered two firearms in the barbershop, one on a counter and the other in a bathroom. *Id.* ¶¶ 74, 180. Plaintiffs, on the other hand, claim that the officers were not lawfully searching the barbershop. They dispute that the officers issued orders that plaintiffs disobeyed. *See, e.g.*, E56 ¶¶ 78, 86, 94-99. Plaintiffs also controvert the officers' representations regarding the firearms and they assert that the officers must have planted the weapons in the barbershop. *See id.* ¶¶ 74, 180.

Plaintiffs Shamaine, Ebony, McCombs, and Gray (*i.e.*, all but Harrell) were formally arrested and charged with various offenses. All criminal charges against plaintiffs were

eventually dismissed.  Plaintiffs now pursue a panoply of claims arising under federal and state law against the officers.  *See* R&R at 4-5.[5]

## Standard of Review

In reviewing a report and recommendation of a magistrate judge, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations . . . ."  28 U.S.C. § 636(b)(1).  Moreover, in conducting its review, the district "court need only satisfy itself that there is no clear error on the face of the record" to accept a magistrate judge's report and recommendation, provided no timely objection has been made.  *Urena v. New York*, 160 F. Supp. 2d 606, 609-10 (S.D.N.Y. 2001) (quoting *Nelson v. Smith*, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985)); *see also Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472, 88 L. Ed. 2d 435 (1985).  However, a district judge is required to "determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010).

## Discussion

Defendants timely objected to certain findings in the R&R.  With respect to the *Shamaine* action, defendants objected that (1) as to Officers Fahim and Moncayo, Shamaine's claim for violation of his right to a fair trial should have been summarily dismissed, *Shamaine* Obj. at 2-3;

---

[5]     The operative *Shamaine* complaint lists 22 causes of action.  *Shamaine* Compl. at 10-27.  The operative *Ebony* complaint lists 23 causes of action.  *Ebony* Compl. at 10-28.  As noted in Magistrate Judge Orenstein R&R, the *Ebony* plaintiffs have withdrawn all claims arising under state law.  *See* R&R at 4; *Ebony*, Dkt. No. 142 at 1 n.1.  Shamaine has withdrawn his abuse of process; negligent screening, hiring and retention; and equal protection claims.  *Shamaine*, Dkt. No. 134 at 41, 50.  Additionally, the R&R recommends dismissing Shamaine's state law negligence and intentional infliction of emotional distress claims.  R&R at 47-48.  No party having objected to this recommendation, and the Court, finding no clear error on the face of it, adopts this portion of the R&R as the opinion of the Court.  Additionally, as discussed *infra* in Section I.C, the balance of Shamaine's state law claims are dismissed.

(2) Shamaine's malicious prosecution claim should have been dismissed as against Officers Ceparano, Desio, Garcia, Tsoi, and Fahim, *id.* at 3-5; and (3) Shamaine's state law claims should have been dismissed as procedurally barred, *id.* at 5-6.

As to the *Ebony* action, defendants interposed five objections to the R&R: (1) that defendants are entitled to summary judgment on Ebony's excessive force claim because Ebony never made such a claim in the operative complaint, *Ebony* Obj. at 2-4; (2) that Harrell's excessive force claim should have been dismissed, *id.* at 4-7; (3) that Officers Fahim and Moncayo should have been granted summary judgment dismissing the fair trial claims made on behalf of McCombs and Gray, *id.* at 7-9; (4) that Ebony's unlawful entry claim should have been dismissed, *id.* at 9-12; and (5) that Ebony's false arrest claim should have been dismissed, *id.* at 12-13.

I.    The *Shamaine* Action

A.    Shamaine's Fair Trial Claim

Shamaine Duncan asserts a § 1983 claim for violation of his right to a fair trial. *Shamaine* Compl. at 13-14. Magistrate Judge Orenstein recommended that the Court deny defendants' motion for summary judgment on this claim as to three defendants – Officers Aliffi, Fahim, and Moncayo – but that it grant the defense motion with respect to the remaining officers. R&R at 42. Defendants point out that two of the three officers against whom the fair trial claim had survived, Officers Fahim and Moncayo, had only provided prosecutorial information relating to Ebony Duncan, and none as to Shamaine Duncan. *Shamaine* Obj. at 2-3. Summary judgment in favor of Officers Fahim and Moncayo should have been granted. The point is conceded. Shamaine acknowledges that his fair trial claim is asserted against Officer Aliffi only. *Shamaine* Obj. Opp. at 3.

5

The R&R is modified to award summary judgment of dismissal to Officers Fahim and Moncayo on Shamaine's fair trial claim.

    B.    Shamaine's Malicious Prosecution Claim

Defendants next object to the R&R on the ground that Shamaine's malicious prosecution claim should have been dismissed as to Officers Ceparano, Desio, Garcia, Tsoi and Fahim, *i.e.*, the subset of defendants who did not sign the criminal court complaint against Shamaine. *Shamaine* Obj. at 3-5. More precisely, defendants take issue with the finding by Judge Orenstein that the non-signing officers could be liable by way of conferring with Officer Aliffi before Aliffi signed the criminal complaint, which formally started the wheels of prosecution to turn. *See Shamaine*, Dkt. No. 128-32 ("Aliffi Dep.") at 179-81.[6]

To prevail on a claim of malicious prosecution under state law, a plaintiff must establish four elements: (1) defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, and (4) the matter terminated in plaintiff's favor. *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). In order to allege a cause of action for malicious prosecution *under § 1983*, a plaintiff must additionally assert that there was "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. New York City Transit Auth. (NYCTA)*, 215 F.3d 208, 215 (2d Cir. 2000).

---

[6]    Plaintiffs' argument that the Court should review the R&R for clear error as to this claim, since "defendants have provided no new argument[,]" is rejected. *Shamaine* Obj. Opp. at 3. Defendants do not simply rehash arguments from their summary judgment papers, but rather, make "specific" objections to Magistrate Judge Orenstein's finding. *See Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002).

As to the first element, "[t]here is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding . . . ." *See Brome v. City of New York*, 02-CV-7184, 2004 WL 502645, at *5 (S.D.N.Y. Mar. 15, 2004). Nevertheless, a plaintiff may overcome this presumption by "demonstrating that the defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Jouthe v. City of New York*, 05-CV-1374, 2009 WL 701110, at *11 (E.D.N.Y. Mar. 10, 2009) (citation omitted). "A police officer may initiate criminal proceedings by bringing charges and having the plaintiff arraigned, by filling out complaining and corroborating affidavits, and by signing felony complaints." *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 392 (S.D.N.Y. 2016); *see also Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005) (denying summary judgment to defendant officers on claim of malicious prosecution and noting that "[d]etective [one] reported that he found the evidence of drugs in the police car to [d]etective [two], who signed the accusatory instrument[]" and therefore "[a] jury could find the officers were sufficiently involved in initiating the criminal proceeding"). A police officer may also be held liable for malicious prosecution if he provides false information to the prosecutor that "influences a decision whether to prosecute." *Douglas v. City of New York*, 595 F. Supp. 2d 333, 342 (S.D.N.Y. 2009) (citation omitted); *see also Ricciuti*, 124 F.3d at 130.

Defendants' objection goes only to the first element, namely whether the officers who did not sign the criminal court complaint "initiated a prosecution" against Shamaine. And defendants are correct that simply participating in the arrest of Shamaine would not be enough for malicious prosecution liability to attach. However, to the extent these officers provided false information that led to his prosecution, as Shamaine alleges, a reasonable jury could find that this

7

element is met. *See Williams v. City of New York*, 06-CV-6601 NGG, 2009 WL 3254465, at *2 (E.D.N.Y. Oct. 9, 2009); *Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999). For example, in *Williams*, plaintiff was arrested for, *inter alia*, resisting arrest. 2009 WL 3254465, at *1-2. On plaintiff's version of the facts, at no point during his interaction with the officers did he struggle or resist in any way. *Id.* at *1. The defendant officers, on the other hand, alleged that plaintiff "struggle[d]" and "ignored several direct orders to stop resisting." *Id.* at *2. The district court denied the defendant officers' motion for summary judgment on plaintiff's malicious prosecution claim, noting that "[o]n [p]laintiff's account of the facts, which the court accepts as true on summary judgment, the officers provided false information about the events leading up to his arrest, which then formed the basis for the criminal complaint against him." *Id.* at *9.

Here, Shamaine, of course, contends that "[a]t no time did [he] resist arrest or engage in any conduct that could reasonably be construed as endangering or threatening any police officer or any other individual . . . ." *Shamaine* Compl. ¶ 20; *see also Shamaine*, Dkt. No. 136-2 ("Shamaine Dep.") at 160 (Shamaine stating that he was not fighting in any way when the officers got to the barbershop). His complaint stands in stark contrast to what four of the five officers testified to during their depositions, and to the undisputed fact that Shamaine was charged with obstructing governmental administration, resisting arrest, attempted assault, disorderly conduct, and criminal possession of a controlled substance. *See Shamaine*, Dkt. No. 136-7; *see also Shamaine*, Dkt. No. 136-18 ("Desio Dep.") at 86-92, 190-92, 214 ("The gentlemen who was being placed under arrest was resisting . . . ."); *Shamaine*, Dkt. No. 128-27 ("Ceparano Dep.") at 93-95, 125, 180 (stating that Shamaine was charging and threatening to kill the officers); *Shamaine*, Dkt. No. 136-13 ("Fahim Dep.") at 74-76 (describing the struggle that

ensued when arresting Shamaine); *Shamaine*, Dkt. No. 128-28 ("Garcia Dep.") at 188 (describing a "fight" with Shamaine).

Additionally, and of great importance, it is undisputed that these officers conferred with Officer Aliffi before Aliffi provided information to the district attorney regarding Shamaine's prosecution. *See* Aliffi Dep. at 178-82; *cf.* Ceparano Dep. at 113-14, 140-41 (noting that Officer Ceparano generally signed off on the accuracy of Officer Aliffi's police reports). More specifically, when asked at his deposition, Officer Aliffi testified:

> Q. Did you speak with all the other officers [t]hat were there?
>
> A. At what point?
>
> Q. Before you spoke with the district attorney?
>
> A. I didn't speak to all of the officers that were there.
>
> …
>
> Q.  You spoke to Police Officer Bruce Ceparano?
>
> A. Yes.
>
> Q. You spoke to Jerry Garcia?
>
> A. Yes.
>
> …
>
> Q. Did you speak to Jin Tsoi?
>
> A. Yes.
>
> Q. Did you speak to John Fahim?
>
> A. I believe, yes, I spoke to John Fahim.
>
> …
>
> Q. What about your partner, Officer Desio?

9

A.  Yes.  I spoke to him.

…

Q.  The information that you gathered from speaking with your

fellow officers assisted you with preparing your police reports?

A.  Yes.  Some of the information that was given to me by my

fellow officers assisted me in preparing these reports.

Aliffi Dep. at 178-81; *see also* Garcia Dep. at 182-83 (noting that Officer Garcia spoke with

Officer Aliffi about the incident).  After conferencing with these officers, Aliffi then provided

information regarding the incident to the district attorney on January 2.  Aliffi Dep. at 182-85.

Taking Shamaine's version of the facts as true, a reasonable jury could conclude that Officers

Desio, Ceparano, Fahim, and Garcia provided Aliffi with false information, which found its way

into the criminal complaint.  *See Williams v. City of New York*, 05-CV-10230, 2007 WL

2214390, at *11 (S.D.N.Y. July 26, 2007).

An identical claim as to Officer Tsoi, in the absence of any supporting evidentiary legs, is

not colorable.  For Officer Tsoi plaintiffs identify no information possessed by him, much less

communicated by him, which they allege to be false.  Indeed, Officer Tsoi testified at his

deposition that, when he arrived at the scene, other than people drinking, he saw nothing

unlawful going on, *i.e.*, no "disorderly [conduct], drugs, guns, fights, criminal activity[.]"

*Shamaine*, Dkt. No. 136-11 ("Tsoi Dep.") at 79.  Therefore, even if he conferred with Officer

Aliffi, the best insight into the information that he would have provided to him is information

that plaintiff, himself, asserts as the truth.  Plaintiff simply relies on the fact that Officer Tsoi was

present on Jersey Street that evening and then "conferred" with Officer Aliffi before Aliffi

signed the criminal complaint.  *See Shamaine* Obj. Opp. at 4-5.

Upon *de novo* review of the relevant portion of the record, therefore, the R&R is modified to award summary judgment of dismissal to Officer Tsoi on Shamaine's malicious prosecution claim. The objection to the R&R as to the malicious prosecution claims against Officers Ceparano, Desio, Garcia, and Fahim is overruled.

C.   Shamaine's State Law Claims

The final objection defendants make to the R&R's finding with respect to Shamaine relates to the state law claims he asserts in his complaint. They argue that the R&R erred in declining to dismiss them on procedural grounds. *Shamaine* Obj. at 5-6. The Court agrees.

In the hodgepodge of process protecting municipalities from suit in New York, pursuant to New York's General Municipal Law ("GML"), Shamaine was required to file a notice of claim and, then, appear for an oral examination, if the City properly requested Shamaine to do so within ninety days of his filing the notice of claim. *See* GML §§ 50-e, 50-h. As the R&R correctly sets out, New York's "[n]otice of claim requirements are strictly construed . . . ." *O'Leary v. City of New York*, 938 F. Supp. 2d 410, 416 (E.D.N.Y. 2013) (quoting *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 793-94 (2d Cir. 1999)); *see also* R&R at 43. After a notice of claim is filed against the city, the city "shall have the right to demand an examination of the claimant . . . ." GML § 50-h. Where a "claimant is represented by an attorney" the demand for examination "shall be served personally or by mail upon his attorney." *Id.* "If such examination is not conducted within ninety days of service of the demand, the claimant may commence the action." *Id.* "The action, however, *may not* be commenced until compliance with the demand for examination if the claimant fails to appear at the hearing or requests an adjournment or postponement beyond the ninety day period." *Id.* (emphasis added).

While compliance with GML § 50–h has been excused in exceptional circumstances, generally, "[a] party who [fails] to comply with a demand for examination pursuant to [GML] § 50–h is precluded from commencing an action against a municipality." *Kemp v. Cty. of Suffolk*, 61 A.D.3d 937, 938, 878 N.Y.S.2d 135, 136 (2d Dep't 2009) (citation omitted); *see also Przybyla v. Cty. of Suffolk*, 09-CV-5129, 2017 WL 1274051, at *3 (E.D.N.Y. Mar. 3, 2017) (dismissing state law claims for failure to reschedule a 50-h hearing); *MB v. Islip Sch. Dist.*, 14-CV-4670, 2015 WL 3756875, at *14 (E.D.N.Y. June 16, 2015) ("Only where a claimant's extreme incapacity has been shown have courts made exceptions to the [GML]'s examination provisions." (citation omitted)).

The record shows, and the parties agree, that Shamaine complied with the notice requirement; however, the record also demonstrates that the New York City Comptroller's Office repeatedly requested that Shamaine appear for an oral examination, and that Shamaine repeatedly failed to do so. The timeline can be summarized as follows:

- On or about March 28, 2011, Shamaine filed a notice of claim, listing Otis Bantum Correctional Center as his address. *Shamaine*, Dkt. No. 136-41. It was signed before a notary public, Wadeedah Sheeheed, who is also Shamaine's attorney of record. *Id.*

- On April 4, 2011, a second notice of claim was filed, this time signed by attorney Jason Leventhal of Leventhal & Klein, LLP ("L&K"), who claimed to represent, not only Shamaine, but the *Ebony* plaintiffs as well. *Shamaine*, Dkt. No. 136-42. Indeed, in that notice of claim, Leventhal represented that he was the "attorney in fact for the claimants in the within action[,]" and signed

12

Shamaine's name:    "SHAMAINE DUNCAN by Jason Leventhal[.]" *Id.* at 4-5. Shamaine's address was listed as that of the law offices of L&K: 45 Main Street, Suite 230, Brooklyn, New York 11201 (the "45 Main Street address"). *Id.* at 1.

- On May 19, 2011, the Office of the Comptroller sent a letter to L&K at the 45 Main Street address, pursuant to GML § 50-h, scheduling an oral examination of Shamaine Duncan for June 7, 2011. *Shamaine*, Dkt. No. 128-16 at 1. Shamaine did not appear for this examination.

- On August 12, 2011, Shamaine filed his initial complaint in this action. *Shamaine*, Dkt. No. 1. The complaint was filed by attorney Wadeedah Sheeheed on behalf of Shamaine. *Id.* at 14. Sheeheed's address was also listed as the 45 Main Street address. *See also Shamaine*, Dkt. No. 1-1 (civil cover sheet).

- The Comptroller sent a series of letters to L&K at the 45 Main Street address, on August 8, 2011, September 29, 2011, and January 25, 2012, seeking an examination of Shamaine. *Shamaine*, Dkt. No. 128-18. Shamaine did not appear for any of these formally-noticed examinations, despite the fact that Attorney Leventhal, reciting his firm address, had filed a § 50-e notice on Shamaine's behalf as his attorney.[7]

---

[7]    It appears from the docket that Wadeedah Sheeheed listed her firm address at 45 Main Street, Suite 230, Brooklyn, New York 11201 until February 2016. *See Shamaine*, Dkt. No. 140.

Shamaine does not contest this timeline or the fact that he never attended a 50-h hearing; however, he claims that L&K never represented him, *i.e.*, that Shamaine never authorized L&K to file a second notice of claim listing its address as his mailing address, and that he was unaware of the 50-h notices. *See* Shamaine Dep. at 22, 50. Shamaine contends that the only contact he had with L&K was sending a letter to L&K, seeking information and advice, at some point before the second notice of claim was filed. *Id.* at 243-44.

Notwithstanding any working relationships, all of which are *de hors* the record, that had to exist between Sheeheed and L&K, operating out of the same law office, there is no dispute that the Comptroller's requests for 50-h hearings were sent to the address listed for Shamaine's attorney of record in this action, *i.e.*, 45 Main Street, Suite 230. *See Shamaine*, Dkt. No. 126 (declaration of Comptroller). Indeed, it is undisputed that Shamaine's attorney of record filed the complaint in this action on August 12, 2011, listing the 45 Main Street address, well before the Comptroller sent three additional letters to (the same) 45 Main Street address seeking an examination of Shamaine. *Compare Shamaine*, Dkt. No. 1 at 14, *with Shamaine*, Dkt. No. 128-18. The Court finds it inconceivable, especially given the close work between L&K and Sheeheed on the *Shamaine* and *Ebony* actions, that Sheeheed was unaware of these requests by the Comptroller, simply because "Leventhal & Klein" was listed as the top-line recipient at the 45 Main Street address, and not Sheeheed. Moreover, both notices of claim had roots in the same law office – in the first, Sheeheed was listed as the notary public, *Shamaine*, Dkt. No. 136-41; the second was filed by L&K, *Shamaine*, Dkt. No. 136-42.

---

Indeed, at the time the hearing notices were sent, Sheeheed maintained her office at the precise street address where each notice was mailed.

Even more powerfully, there is no dispute in the record that Wadeedah Sheeheed was communicating with L&K at the time the Comptroller's Office was sending § 50-h notices to the 45 Main Street address. Again, it would confound the practice of a small suite office that such mail would not be redirected to the attorney actually handling the matter. This is especially true here where the record is crystal clear that lawyers from L&K collaborated closely with Sheeheed on many aspects of this litigation. *See, e.g., Shamaine*, Dkt. No. 76 (Sheeheed cc'ing Lissa Green-Stark, formerly with L&K, and lawyer for the *Ebony* defendants, on a motion to compel); *Shamaine*, Dkt. No. 87 (Sheeheed cc'ing Green-Stark). Certainly, plaintiff offers absolutely no admissible proof to the contrary.

What is also incontrovertible is that Attorney Leventhal's firm, L&K, did file a § 50-e notice on Shamaine's behalf. It bears noting that the notice of claim filed by L&K explicitly sets out that attorney Leventhal, "being duly sworn, deposes and says: . . . [that Leventhal] is the attorney in fact for the claimants" and that the statements made in the notice of claim are "true based on the statements made to [Leventhal] by [the] claimants." *Shamaine*, Dkt. No. 136-42 at 5. All that stands against it is Shamaine's naked assertion that he did not authorize it, in the absence of even an attorney affidavit from L&K or from Sheeheed that she was unaware of the Comptroller's requests for hearings. Such naked assertions by Shamaine, in the teeth of sworn documentary proof to the contrary, does not in and of itself create a material dispute of fact. *See Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012).

In sum, there is no genuine material dispute: Shamaine cannot disclaim receipt of the § 50-h notices, nor, therefore, his failure to appear. Consequently, the balance of Shamaine's state

law claims should have been dismissed, and the recommendation of the R&R to the contrary is rejected.

    II.    The *Ebony* Claims

        A.    Ebony's Excessive Force Claim

      Defendants contend that, contrary to the findings and recommendation in the R&R, they are entitled to summary judgment on Ebony's excessive force claim, or, more precisely, that, since Ebony never pleaded such a claim in the operative complaint, the putative excessive force claim must be dismissed. *Ebony* Obj. at 2-4; *see also* R&R at 32. The *Ebony* plaintiffs do not contest this. *Ebony* Obj. Opp. at 2. Given the parties agreement on this point, the Court modifies the R&R to reflect that any excessive force claim putatively asserted on behalf of Ebony Duncan is dismissed.

        B.    Harrell's Excessive Force Claim

      The *Ebony* defendants next object that Magistrate Judge Orenstein erred in recommending that Harrell's excessive force claim, which alleges that she was pushed to the floor by Officer Ceparano in violation of her constitutional rights, should not be dismissed. *Ebony* Obj. at 4-7; *see also* R&R at 31. Generally, defendants argue (1) that Harrell's injury was *de minimis*; (2) that the force applied by Officer Ceparano was objectively reasonable; and (3) that, in any event, Ceparano would be entitled to qualified immunity for the push. Because the Court finds that Officer Ceparano's actions were objectively reasonable, and, additionally, because Officer Ceparano would, in any case, be entitled to qualified immunity for any push, Harrell's excessive force claim is dismissed.

      The facts pertinent to Harrell's excessive force claim are as follows; there is no substantial dispute about them. Harrell was at the barbershop along with the other New Year's

Eve revelers who are plaintiffs here. *Ebony*, Dkt. No. 136-23 ("Harrell Dep.") at 106-09. At an unspecified point, Harrell heard what she described as gun shots and she reactively got to the floor. *Id.* at 110. At some point, presumably after the radio run for shots fired that brought them to the scene, officers entered the barbershop. *Id.* at 116-17. Harrell found herself standing between Shamaine and some of the police officers. Now proximate to police action, she was repeatedly asked to step to the side. *Id.* at 119. It is undisputed that she failed to follow these orders. *Id.*; D56 ¶¶ 189-90; E56 ¶¶ 189-90. Harrell then witnessed, as she explained in her deposition, an officer grab Ebony. Harrell Dep. at 131. Harrell, in response, stepped in front of Ebony and, she goes on to testify, told the officer to release Ebony. *Id.* at 131, 335-37. As she continued to interfere in the police action against Ebony, from behind, Harrell felt herself pushed. *Id.* She fell to the floor, she says, as a result of the push. *Id.*

An "excessive force claim aris[ing] in the context of an arrest or investigatory stop of a free citizen, . . . is most properly characterized as one invoking the protections of the Fourth Amendment[.]" *See Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989). Determining whether the force used during a particular seizure is "reasonable" under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Id.* at 396 (citation and internal quotations omitted). Accordingly, the level of force used must be balanced against "the facts and circumstances of each particular case, including the [1] severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9, 105 S. Ct. 1694, 1699-1700, 85 L. Ed. 2d 1 (1985)). In doing so, courts are to evaluate

17

the record "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (internal quotations and citation omitted). Moreover, district courts "are required to make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (internal quotations and citation omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham,* 490 U.S. at 396 (internal quotations and citation omitted).

        (1)    Injury

     As to defendants' first argument, upon *de novo* review, the Court agrees with Magistrate Judge Orenstein that, although an extremely close call, summary judgment for defendants is not appropriate on this ground. *See* R&R at 31. It is not a foregone conclusion that any harm was *de minimis*. Harrell testified that, as a result of being knocked to the floor, she developed a lump on her right knee, that the knee turned black and blue, and that she was impaired with a limp for three-to-four days following the incident. Harrell Dep. at 142-43, 263, 271-72. Ebony also testified that she treated the injury with ice, an Ace bandage, and Ibuprofen. *Id.* Although Harrell's injuries were, uncontestedly, not severe, that she did not take pictures, that she did not seek medical treatment, and that there is no proof offered discounting that her prior descent to the floor upon hearing gun shots was the cause of some or all of her injuries, these factors, by themselves, do not doom Harrell's excessive force claim as a matter of law. *See id.* at 143, 272; *see also Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987).

(2)    Force

Upon a careful balancing of the nature and quality of the intrusion on Harrell's Fourth Amendment interests against countervailing governmental interests, however, the Court finds that any push by Officer Ceparano was objectively reasonable.

Decisively here, there are no factual disputes regarding the actual force used that would prevent the award of summary judgment to defendants on Harrell's excessive force claim. The parties are in agreement that she was shoved during a chaotic situation in which multiple officers responding to a "shots fired" call were packed into the barbershop with multiple civilians. There is no suggestion that the shove came in combination with any other force or object. *Cf. Sash v. United States*, 674 F. Supp. 2d 531, 539 (S.D.N.Y. 2009) (forcibly shoving plaintiff into metal gate, following voluntary surrender, could be actionable conduct). More pointedly, the parties are in agreement that Harrell was shoved as she stepped in front of Ebony during the course of Ebony's arrest, and that Harrell was on the floor for "maybe . . . a second." Harrell Dep. at 131. Indeed, in dismissing Harrell's false arrest claim, Magistrate Judge Orenstein noted that Harrell ignored repeated requests by an officer to step aside and that, therefore, "*[t]he record . . . conclusively demonstrated a level of affirmative interference that established probable cause to arrest Harrell for OGA[.]*" R&R at 19.

Additionally, courts in this circuit have consistently held that some use of force to effectuate an arrest is not objectively unreasonable. *See, e.g., Lieberman v. City of Rochester*, 558 F. App'x 38, 39 (2d Cir. 2014). For example, in *Lieberman*, similar to what transpired here, in the early morning hours of June 1, 2007, an altercation erupted between two groups of people. *See* 07-CV-6316L, 2011 WL 13110345, at *1 (W.D.N.Y. Apr. 29, 2011), *aff'd*, 558 F. App'x 38 (2d Cir. 2014). At some point the police arrived and plaintiffs, demanding that the officers take

19

action against their opponents in the altercation, were arrested. *Id.* "Plaintiff Lieberman allege[d] that when he attempted to verbally intervene in the confrontation between the officers and the other plaintiffs," a defendant officer grabbed Lieberman's arm, body slammed him to the ground and handcuffed him. *Id.* The district court dismissed the excessive force claim, and the Second Circuit affirmed (by way of summary order), noting that "[g]iven the volatility of the situation into which the officers intervened, . . . the force allegedly used against Lieberman was reasonable, and thus Lieberman's excessive force claim was correctly dismissed by the district court." *Lieberman*, 558 F. App'x at 39; *see also Crowell v. Kirkpatrick*, 400 F. App'x 592, 595-96 (2d Cir. 2010) (affirming decision that use of a taser in effectuating an arrest, in those circumstances, did not amount to excessive force).

Plaintiff attempts to distinguish these cases by arguing that Harrell, unlike the plaintiffs in those cases, was not being arrested when she was shoved, making those cases distinguishable from what transpired here. *Ebony* Obj. Opp. at 5. She cites no authority for the proposition that the distinction makes a difference in the force analysis. *Id.* In any event, gone unaddressed by Harrell is the undisputed fact that the offending shove, by all accounts, was, indeed, "tethered to the goal of effecting an arrest", *Crowell*, 400 F. App'x at 596 – that is, "tethered" to stopping Harrell from physically obstructing the arrest of Ebony in a very volatile situation.

      (3)    Qualified Immunity[8]

---

[8]    Harrell's threshold challenge to this objection is that the objection should be disregarded because the specific argument it raises was not made in defendants' original motion papers, or that, in the alternative, the Court should review the qualified immunity portion of the R&R for clear error, "to the extent that defendants . . . advance[d] a much more cursory qualified immunity argument" in their original papers. *Ebony* Obj. Opp. at 4. That threshold challenge is rejected. Setting aside the fume and furry, it is clear that defendants *did* argue, in their Memorandum of Law in Support of Their Motion for Summary Judgment, that defendants were entitled to qualified immunity as to Harrell's excessive force claim. *Ebony*, Dkt. No. 133 at 28.

As many courts have opined, the doctrine of qualified immunity shields government officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (citation omitted). While precedent does "not require a case directly on point," for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (citation omitted). Moreover, "[e]ven if the right at issue was clearly established in certain respects, . . . an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (internal quotations and citation omitted). Stated simply, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "In this instance, the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995) (internal quotations and citation omitted).

Here, it is not the case that "existing precedent placed the conclusion that [Officer Ceparano] acted unreasonably in these circumstances 'beyond debate.'" *Mullenix*, 136 S. Ct. at 309 (citation omitted); *see also Salazar v. City of New York*, 15-CV-1989, 2016 WL 3748499, at *6 (S.D.N.Y. July 11, 2016) (because it was not "obvious that no reasonably competent officer

---

That this argument was presented in a slightly briefer manner is of no moment to the Court. All that matters is that the point was presented and rejected in the R&R. *See* R&R at 40. Now, defendants are entitled, upon their written objection, to *de novo* ("from the start") review.

would have concluded that bringing plaintiff to the ground, kneeing her in the back, and twisting

her arm to effect arrest in this scenario was an unlawful use of force, [the officer] would be

entitled to qualified immunity") (internal quotations and citation omitted).

Accordingly, since, on the undisputed facts, the force used against Harrell was

objectively reasonable given the totality of the circumstances that evening in the barbershop and,

in the very least, since reasonable debate can be entertained about the constitutionality of Officer

Ceparano's shove, the Court grants defendants' motion for summary judgment as to Harrell's

excessive force claim.[9]

C.    Fair Trial Claims by McCombs and Gray

The parties do not now dispute, as defendants have objected, that Officers Fahim and

Moncayo should have been granted summary judgment dismissing the fair trial claims arguably

made on behalf of plaintiffs McCombs and Gray. *Ebony* Obj. at 7-9.  Indeed, the *Ebony*

plaintiffs concede that Gray and McCombs "assert their claim for right to fair trial as to [Officer]

Aliffi only." *Ebony* Obj. Opp. at 7.  As a result, the R&R is adopted on this point as modified to

grant Officers Fahim and Moncayo summary judgment, dismissing any fair trial claims that may

have been asserted by Gray and/or McCombs against them.

D.    Ebony's Unlawful Entry Claims

As the pertinent and undisputed facts make plain, and contrary to the corresponding

findings and conclusions of the R&R to which defendants have objected, Ebony's claim relating

---

[9]    As a consequence of the dismissal of the excessive force claims, the related application
by defendants that Harrell's failure to intervene claim, and supervisory liability claim, premised
on Harrell's excessive force claim is granted, and these claims are dismissed given their
derivative nature. *See Ebony* Obj. at 7 n.2.

to unlawful entry of the barbershop by the police should have been dismissed. Those facts follow.

There is no genuine dispute that, to set the scene, as the clock struck midnight, Shamaine Duncan witnessed a fight taking place across the street from the barbershop. *Ebony*, Dkt. No. 144-1 ("Ebony Dep.") at 92, 94. At or around the same time, shots were fired prompting the police to receive several 911 calls about the shooting. *See Ebony*, Dkt. No. 136-7 (sprint report). In fact, plaintiff Breyon Gray, who was present at the barbershop that night, heard the shots ring out, as did Harrell. *Shamaine*, Dkt. No. 136-4 ("Gray Dep.") at 131; Harrell Dep. at 110. The police arrived, according to Ebony, a "couple of minutes" after the fight had ended. Ebony Dep. at 94-95.

Around the time that the responding police officers arrived on the scene, people on the street started to scatter and approximately ten persons entered her barbershop. *Id.* at 95. Ebony proceeded to tell the intruders that they could not stay in the barbershop and that they had to exit immediately. *Id.* at 96. The intruders exited the shop "as the police were already in front of [her] door." *Id.* A group of officers came into the shop; within seconds another group followed; and seconds after, yet another group arrived. *Id.* at 107. As the first officer opened the door, he asked Ebony: "What's going on in here?" To which Ebony responded: "Officer, we're having a get-together and I was just trying to escort these people out of my shop." *Id.* at 108. At that point, the officers entered the barbershop. *Id.* at 109.

Certainly, in analyzing a warrantless entry, it is well-settled that it is constitutionally permissible for the police to make a warrantless entry into a private place when the police are in "hot pursuit" of a suspect. *See United States v. Santana*, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). Hot pursuit involves following an individual from a public place into a

private place, and applies when a pursuit is immediate and fairly continuous from the scene of the crime. *See Welsh v. Wisconsin*, 466 U.S. 740, 753, 104 S. Ct. 2091, 2099, 80 L. Ed. 2d 732 (1984).  It bears more than a moment of reflection to assure understanding that "hot pursuit" is "'not a limitation but rather an illustration of the kind of exigent circumstance justifying entry without a warrant to arrest a suspect.'"  *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987) (citation omitted).

Case law surely provides guidance.  The general test for determining whether a warrantless entry can be justified by exigent circumstances is an objective one that turns on an "examination of the totality of circumstances confronting law enforcement agents in the particular case."  *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990).  The Second Circuit has adopted six factors as guideposts for evaluating the existence of exigent circumstances:

> the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*MacDonald*, 916 F.2d at 769-70 (citation omitted); *see also United States v. Gordils*, 982 F.2d 64, 69 (2d Cir. 1992).  Yet, at bottom, "[t]he core question, is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or take action."  *United States v. Moreno*, 701 F.3d 64, 73 (2d Cir. 2012) (quoting *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008)).

Here, Magistrate Judge Orenstein determined that "there were issues of fact 'about the location of the fight,' . . . whether 'the officers who entered were chasing participants – or indeed chasing anyone at all' and whether the intruders 'had already left the barbershop'" by the time officers entered. *Ebony* Obj. at 9 (citing R&R at 9). After a thorough review of the record, not all of these facts appear contested. To begin, the Court agrees with defendants that there is no meaningful dispute in the record as to the general location of the fight on New Year's Eve 2011. Indeed, Ebony Duncan explicitly stated that she could see a group of some ten to twenty people fighting across the street from the barbershop located at 411 Jersey Street. *Ebony*, Dkt. No. 134 ¶ 48; E56 ¶ 48; Ebony Dep. at 94, 99. Secondly, there also does not appear to be a material dispute as to whether certain officers entered the barbershop, at least initially, in pursuit of persons who had fled from Jersey Street, which was also the vicinity of the shots fired report. *Ebony*, Ex. 144-19 ("Hotaling Dep.") at 77-82 (testifying that persons ran into the barbershop). Importantly, though inferential as it may be, there was confirmation from Ebony, who testified that, it was "safe to assume the police officers" upon their arrival "saw [individuals] run into the shop." *Id.* at 108.

It must be acknowledged, though not creating a dispute of material fact, that the testimony is not entirely in harmony as to the precise sequence of events as the police arrived on scene. Ebony testified that the fight had subsided when she perceived the arrival of the police. *See* Ebony Dep. at 95. At least one officer, however, testified that he witnessed the fight still in progress when he arrived on scene. *See* Hotaling Dep. at 78. Though Ebony's testimony does not contradict the police testimony, since she could not testify as to what the police may have

been able to see before she perceived their presence, the differences remain relevant to consideration of the "hot pursuit" exception to the warrantless search rule.[10]

What is critical, however, is not that there are factual disputes, but that these disputes are immaterial since they do not create a genuine dispute about an elemental fact. Even accepting Ebony's representation that the fight had subsided a few moments before the first officer had arrived, as the Court must, since she is the nonmoving party, it is otherwise undisputed that, a street fight involving upward of two dozen persons had erupted on Jersey Street; multiple witnesses had phoned 911 with reports of "shots fired"[11]; upon arrival, officers encountered a group of persons gathered on the street; certain of those persons fled into the barbershop; and the barbershop owner told police that she was escorting unwanted intruders from her shop. Viewed through the lens of the *MacDonald* exigency test, at least four of the six factors favor the defendants on these facts – the gravity or violent nature of the offense with which the suspects are to be charged (assault and firearms); whether the suspects are reasonably believed to be armed (multiple reports of "shots fired"); a strong reason to believe that the suspects are in the premises being entered (observations by police, and Ebony's acknowledgment, of the presence

---

[10]    Officer Ceparano testified that, upon arriving at the scene, he witnessed everyone "running" and certain individuals running into the barbershop "[h]olding their waistbands." Ceparano Dep. at 137-38. The Court will disregard this testimony in its analysis given the possible inconsistency with other officers' testimony. More specifically, Officer Ceparano arrived to the scene with two other officers, Officers Tsoi and Garcia. D56 ¶ 63; Ceparano Dep. at 119. One of these officers, Officer Tsoi, testified that when he arrived he observed "people walking around" and that the reason he entered the barbershop was because "[t]here was other police officers in there." Tsoi Dep. at 72-73, 79. Officer Garcia testified similarly. Garcia Dep. at 38.

[11]    Officer Garcia testified to hearing a "ten-ten, shots fired" over the radio, Garcia Dep. at 28, 118-21, and Officer Aliffi also testified that the radio run set out that there were "[p]eople fighting in the street and people having firearms" and "[a] hundred people fighting in the street with guns." Aliffi Dep. at 118, 134; *see also Ebony*, Dkt. No. 136-7 (sprint report).

of intruders); and, a likelihood that the suspect will escape if not swiftly apprehended (had already fled upon police arrival). *See MacDonald*, 916 F.2d at 769-70.

Perhaps not unexpectedly, even if a genuine dispute of material fact were to be found on this point, there would remain one hurdle plaintiff cannot vault – qualified immunity. Even if exigency were not established as a matter of law, defendants are entitled to qualified immunity for any unlawful entry into the barbershop given that "reasonable officers could disagree as to whether exigent circumstances were present." *Loria v. Gorman*, 306 F.3d 1271, 1287 (2d Cir. 2002); *see also Koch v. Town of Brattleboro, Vermont*, 287 F.3d 162, 169 (2d Cir. 2002). Powerfully reprised, multiple persons reported "shots fired" from a location that Ebony does not contest was within viewing distance from her barbershop. Nor is it contested that, regardless whether they might have been engaged in a brawl before, police officers observed a group – one that recently scattered on the arrival of the police – and officers observed some enter the shop. Indeed, the shop owner confirmed that intruders entered the shop. *See also* Shamaine Dep. at 128 (describing how "strangers" ran into the barbershop); Harrell Dep. at 107-09. Reasonable officers are entitled to the belief that certain of the persons running from that location were armed, and, accordingly, pursue them into the barbershop. On qualified immunity grounds alone, summary judgment is warranted for defendants on Ebony's unlawful entry claim. The contrary recommendation of the R&R is not adopted, and the objection is sustained.

E.   Ebony's False Arrest Claim

The final objection by defendants is directed at Magistrate Judge Orenstein's recommendation that the Court deny defendants' motion for summary judgment on Ebony's false arrest claim, since a jury could rationally infer that Ebony did not move with the requisite intent to interfere with governmental administration (but, rather, out of concern for her

27

brother).[12] *Ebony* Obj. at 12-13. Defendants assign error on the ground that the analysis improperly requires an officer to speculate as to the state of mind of the arrestee and that, as a matter of law, Ebony's intentions are irrelevant to a probable cause determination. *See Ebony* Obj. at 12. Although on slightly different reasoning, the Court adopts Magistrate Judge Orenstein's recommendation and overrules this objection.

Now, viewing the facts in the light most friendly to Ebony, at some point after the officers entered her barbershop, Ebony saw her brother, Harrison, get hit in the head with a baton, saw his eyes roll into the back of his head, and saw him fall to the ground. Ebony Dep. at 143. At that point she tried to go over to him, but was held by Officer Aliffi[13] against a soda machine. *Id.* at 145-48.

This claim stands or falls on whether there was probable cause to believe Ebony was guilty of OGA. As relevant here, a person is guilty of obstructing governmental administration when, "by means of intimidation, physical force or interference" he "intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function[.]" N.Y. Penal Law § 195.05; *see also Bradley v. Jusino*, 374 F. App'x 144, 146 (2d Cir. 2010); *Ebony*, Dkt. No. 133

---

[12]     Ebony was actually charged with two counts of criminal possession of a weapon in the fourth degree. D56 ¶ 184. Defendants moved for summary judgment as to Ebony's false arrest claim, *inter alia*, on the ground that even though she was not charged with OGA, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to . . . any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006); *see also Ebony*, Dkt. No. 145 at 5-10.

[13]     Defendants' 56.1 statement identified Officer Aliffi as the officer who held Ebony back. D56 ¶ 173. Officer Aliffi does not recall whether he took any enforcement action against Ebony, but does not believe that he did. Aliffi Dep. at 269-72.

at 6. By judicial construction, the "official function" at issue must be proven to have been a lawful exercise of public duty, *Diehl v. Munro*, 170 F. Supp. 2d 311, 316 (N.D.N.Y. 2001), and the arrestee's intent must be to prevent the public servant from engaging in a specific official function, *Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 545-46 (E.D.N.Y. 2015). *See also In re Armell N.*, 28 Misc. 3d 528, 531, 905 N.Y.S.2d 471, 474 (Fam. Ct., Kings Cnty. 2010) (collecting cases). "Physical force or (physical) interference can consist of inappropriate and disruptive conduct at the scene of the performance of an official function." *People v. Tarver*, 188 A.D.2d 938, 938, 591 N.Y.S.2d 907, 908 (3d Dep't 1992) (citation omitted).

Based on those facts not materially disputed here, and regardless what the facts might show Ebony's intent to be, a reasonable jury could find that Ebony's actions did not rise to a level of interference required to support probable cause for OGA. While the court is aware of cases, like *Tarver*, 188 A.D.2d 938, establishing that the "threatening approach by defendant toward the back of a police officer . . . constitute[s] a knowing, physical interference with and disruption of the [arrest] being performed", the facts here are quite distinguishable, given the complete lack of evidence in the record indicating that Ebony was acting in a threatening manner as she took what might be reasonably characterized as one or two steps toward her brother. *See Rasin v. City of New York*, 14-CV-5771, 2016 WL 2596038, at *7 (E.D.N.Y. May 4, 2016) ("[T]hese cases are all distinguishable . . . . Unlike *Tarver*, the video does not show [plaintiff] acting threateningly or aggressively."). As a practical matter, moreover, there is also no indication that she was within any proximity to her brother.[14] Consequently, for these reasons,

---

[14]    It should be noted however, that, just because Ebony may have moved towards her brother out of "concern" for him, that does not, by itself, prevent the formation of the requisite intent for OGA. It is entirely possible that a person can both take an action motivated by their

the Court overrules the objection and adopts Judge Orenstein's recommendation that defendants' motion for summary judgment on Ebony's false arrest claim be denied.

III.    Plaintiff Harrell

Given that all claims brought by Harrell have now either been voluntarily withdrawn or decided in favor of defendants, it comes to pass that Harrell is no longer a proper plaintiff in the *Ebony* action. *See* R&R at 19 (recommending, without objection[15], that Harrell's false arrest and failure to intervene claims be dismissed); *supra* Section II.B (granting summary judgment on Harrell's excessive force claim and derivative failure to intervene and supervisory liability claims); *Ebony*, Dkt. No. 142 at 1 n.1 (*Ebony* plaintiffs dismissing certain claims).

Conclusion

For the foregoing reasons, the Court adopts Magistrate Judge Orenstein's R&R as the opinion of the Court but as modified by this Memorandum and Order.  For ease of reference, the modifications are recapitulated below:

- Officers Fahim and Moncayo are now granted summary judgment, dismissing any fair trial claim that may have been asserted by plaintiff Shamaine.

- Shamaine's malicious prosecution claim is dismissed as to Officer Tsoi.

---

concern for another but, in the course of acting, intend to interfere with the official function of an officer, amounting to a violation of law.

[15]    Any attempt by plaintiffs to "object" to this finding by way of a footnote in their opposition to defendants' objections, *Ebony* Obj. Opp. at 5 n.1, is both untimely (made long after the October 17, 2016 deadline) and improper. *See also Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 11 CIV. 1529 KMW, 2014 WL 684831, at *2 n.2 (S.D.N.Y. Feb. 21, 2014).  Finding no clear error on the face of the R&R regarding Harrell's false arrest and failure to intervene claims, the Court adopts this portion of the R&R as the opinion of the Court.

- Shamaine's state law claims are dismissed as to all defendants for failure to comply with the requirements of GML § 50-h.

- Ebony retains no excessive force claims against any defendant.

- Defendants are granted summary judgment as to Harrell's excessive force claim, the related failure to intervene claim, and the supervisory liability claim, premised on Harrell's excessive force claim.

- Officers Fahim and Moncayo are granted summary judgment, dismissing any fair trial claims that may have been asserted by plaintiffs Gray and/or McCombs.

- Ebony's unlawful entry claim is dismissed as to all defendants.

Moreover, all plaintiffs having withdrawn claims against Officer Kalicovic, *see Shamaine*, Dkt. No. 134 at 19, *Ebony*, Dkt. No. 142 at 29, the Clerk of Court is directed to terminate Officer Kalicovic from both the *Shamaine* and *Ebony* dockets.

For purposes of clarity and in the aftermath of motion practice, the Court observes that the following claims apparently remain in the *Shamaine* action:

- Shamaine's § 1983 excessive force and related failure to intervene claims, R&R at 49;

- Shamaine's § 1983 false arrest and related failure to intervene claims as to all defendants, with the exception of Officer Santos, *id.* at 17, 23;

- Shamaine's § 1983 malicious prosecution claim as against Officers Aliffi, Ceparano, Desio, Fahim, and Garcia, *supra* Section I.B;

- Shamaine's § 1983 fair trial claim as against Officer Aliffi, *supra* Section I.A; and

- Shamaine's § 1983 supervisory liability claim as against Officers Denesopolis, Hotaling, Isaac, and Ceparano, R&R at 42-43.

31

As for the *Ebony* action,[16] the list is as follows:

- Ebony's § 1983 false arrest and related failure to intervene claims as against all defendants, less Officers Santos, R&R at 18, 23-25, 27-29;

- Ebony's malicious prosecution claim as against Officers Aliffi, Moncayo, and Fahim, *id.* at 36;

- Ebony's § 1983 fair trial claim as against Officer Aliffi, Moncayo, and Fahim, *id.* at 42;

- Gray's § 1983 false arrest and related failure to intervene claims as against all defendants, less Officer Santos, *id.* at 19, 23, 25, 29;

- Gray's § 1983 excessive force and related failure to intervene claims as against all defendants, less Officers Aliffi and Howard, *id.* at 32;

- Gray's § 1983 malicious prosecution claim against Officers Aliffi, *id.* at 36-37;

- Gray's § 1983 fair trial claim as against Officer Aliffi, *supra* Section II.C;

- McCombs's § 1983 false arrest and related failure to intervene claims as against all defendants, R&R at 18, 23, 29;

- McCombs's § 1983 excessive force and failure to intervene claims as against all defendants, less Officer Howard, R&R at 32;

- McCombs's § 1983 malicious prosecution claim against Officer Aliffi, R&R at 36-37;

- McCombs's § 1983 fair trial claim as against Officer Aliffi, *supra* Section II.C; and

---

[16]     As a categorical matter, Officer Dinkle is not listed a defendant in the *Ebony* action and, therefore, no claims by the *Ebony* plaintiffs implicate him.

- Ebony's, McCombs's and Gray's § 1983 supervisory liability claims as against Officers Denesopolis, Hotaling, Isaac, and Ceparano, R&R at 42-43.[17]

Finally, counsel are directed to contact United States Magistrate Judge James Orenstein to arrange for a conference as to further pretrial matters.

So Ordered.

Dated: Brooklyn, New York
       July 17, 2017

                                        /s/ USDJ ERIC N. VITALIANO
                                        _____
                                        ERIC N. VITALIANO
                                        United States District Judge

---

[17]    Lastly, left unaddressed are blanket claims for "deprivation of rights" under 42 U.S.C. § 1983 in both the *Shamaine* and *Ebony* actions. *See Shamaine* Compl. at 10; *Ebony* Compl. at 10. As these claims are subsumed entirely by the more specific § 1983 claims discussed in great detail in the R&R and the instant Memorandum & Order, and to the extent they were to stand separately in each action, these claims are dismissed. *See Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, 06-CV-3893 JFB AKT, 2010 WL 446042, at *11 (E.D.N.Y. Feb. 1, 2010) (dismissal of claim that was duplicative and moot).